IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

TERRI F. KIRCHNER,

Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

Defendant.

No. C12-2049

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.     INTRODUCTION ................................. 2

II.    PRIOR PROCEEDINGS ............................ 2

III.   PRINCIPLES OF REVIEW ......................... 3

IV.    FACTS ........................................ 5
       A.   Administrative Hearing ................. 5
            1.   McDonald's Testimony ............. 5
            2.   Kirchner's Testimony ............. 6
            3.   Vocational Expert's Testimony .... 8
       B.   Kirchner's Medical History ............ 9

V.     CONCLUSIONS OF LAW .......................... 17
       A.   ALJ's Disability Determination ........ 17
       B.   Objections Raised By Claimant ......... 19
            1.   Dr. Vreeke's Opinions ........... 19
            2.   RFC Assessment .................. 23

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

    *C.    Reversal or Remand* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*VI.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*VII. ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## I.  INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Terri F. Kirchner on July 13, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title XVI supplemental security income ("SSI") benefits.  Kirchner asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide SSI benefits.  In the alternative, Kirchner requests the Court to remand this matter for further proceedings.

## II.  PRIOR PROCEEDINGS

Kirchner applied for SSI benefits on April 15, 2009.  In her application, Kirchner alleged an inability to work since June 30, 2007 due to "constant headache w/intermittent migraines; pinched nerves and mushed discs in neck; stiffness in neck along w/arthritis; arthritis in neck, hands & feet; bursitis in hips & shoulders; loss of hearing; lower back pain & hip pain; Plantars Fasciitis & bunions."[2]  Kirchner's application was denied on July 22, 2009.  On March 17, 2010, her application was denied on reconsideration.  On April 30, 2010, Kirchner requested an administrative hearing before an Administrative Law Judge ("ALJ").  On August 17, 2011, Kirchner appeared via video conference with her attorney before ALJ Julie K. Bruntz for an administrative hearing.  Kirchner, her husband, Mark McDonald, and vocational expert Roger F. Marquardt testified at the hearing.

---

[2] Administrative Record at 152.

In a decision dated October 17, 2011, the ALJ denied Kirchner's claim. The ALJ determined that Kirchner was not disabled and not entitled to SSI benefits because she was functionally capable of performing her past relevant work as a cashier of a convenience store or, alternatively, of performing other work that exists in significant numbers in the national economy. Kirchner appealed the ALJ's decision. On May 18, 2012, the Appeals Council denied Kirchner's request for review. Consequently, the ALJ's October 17, 2011 decision was adopted as the Commissioner's final decision.

On July 13, 2012, Kirchner filed this action for judicial review. The Commissioner filed an Answer on October 2, 2012. On November 3, 2012, Kirchner filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing her past relevant work, or performing work that exists in significant numbers in the national economy. On January 2, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On January 15, 2013, Kirchner filed a reply brief. On September 17, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

3

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's

4

decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Employment Background

Kirchner was born in 1958. The record contains a detailed earnings report for Kirchner. The report covers the time period of 1975 to 2011. Prior to 1990, Kirchner earned less than $600.00. In 1990, she earned $1,020.00. She earned $5,906.09 in 1991. She had no earnings from 1992 to 1994. From 1995 to 1999, she earned between $1,559.02 (1997) and $3,410.51 (1998). Kirchner, again, had no earnings from 2000 to 2005. In 2006, she earned $5,999.00. She has no earnings since 2007.

### A. Administrative Hearing

#### 1. McDonald's Testimony

Kirchner's husband, Mark McDonald, testified briefly at the administrative hearing.[3]  McDonald testified that Kirchner had "always been very outgoing, very

---

[3] The legal relationship between Kirchner and McDonald is somewhat imprecise.
(continued...)

5

physical, used to hunt, fish, camp."[4]  In fact, Kirchner worked with McDonald installing hardwood floors "when we had our own business."[5]  In the last several years, however, there's been a definite "decline."  According to McDonald, Kirchner is not capable of doing "that kind of manual labor," and mentally "it's like she operates in a fog most times."[6]

McDonald testified that Kirchner has days "when it's not quite as bad," but estimated that 85 to 90 percent of the time "are bad days for her."[7]  According to McDonald, he has seen Kirchner get headaches "so severe that when she vomits the next day her eyes are actually black and blue, like she's been beaten."[8]

## 2. *Kirchner's Testimony*

At the administrative hearing, Kirchner's attorney asked her to explain what she believes keeps her from working.  Kirchner initially indicated that "with having the

---

[3] (...continued)

In her application, Kirchner describes McDonald as her spouse. *See* Administrative Record at 120 and 151.  Similarly, in a "function report" prepared by McDonald on May 7, 2009, he described Kirchner as his spouse. *See* Administrative Record at 175. Elsewhere, however, McDonald states that Kirchner is his "fiancé," administrative record at 196, or the question is left blank. *See* Administrative Record at 189 and 206.  When the ALJ asked at the hearing "how long have you been married," McDonald answered "we've been together, oh my, 16 years, I believe."  When asked by Kirchner's attorney whether they were legally married, McDonald responded "I'm not sure how to answer that question, I know we fall under the thing of common law marriage in the state of Iowa, and we do file our tax returns together."  Administrative Record at 43.

[4] Administrative Record at 42.

[5] *Id.*

[6] Administrative Record at 42.

[7] *Id.* at 43.

[8] *Id.*

6

constant headache and the migraines, it's really hard to get anything accomplished."[9] In addition to headaches, Kirchner testified she has pain in "my head, my neck, my shoulders, arms, my back, my knees, my hips, my feet."[10] Kirchner stated that she takes various medications which she believes "might help a little." Kirchner acknowledged that "I can do some of the same things I used to do, but it just takes me a lot longer and I'm in a lot more pain."[11] According to Kirchner, she does not do dishes, can only do the laundry for the "small stuff," does not cook, and only drives to town (approximately 9 miles) twice a month.[12] She is no longer able to sew or crochet, and if she tries to write anything, "my hands cramp up on me."[13] On her best days, she places her pain level at 5 on a scale of 1 to 10 with 10 being the most severe pain.[14]

In response to questioning by the ALJ, Kirchner testified that her symptoms started in May 2007, when she was painting her house. She thought her symptoms would get better, so she did not see a doctor until November 2007. She stated that while she takes medication for her migraine headaches regularly, she still suffers from them, and they typically last anywhere from 12 to 72 hours.[15] According to Kirchner, she is not able to attend very many of her 14-year-old son's school activities. Kirchner opined that she could sit for 30-45 minutes during an 8-hour day. When asked how long she could stand

---

[9] *Id.* at 44.

[10] *Id.*

[11] *Id.* at 45.

[12] *Id.* at 46.

[13] Administrative Record at 46.

[14] *Id.*

[15] *Id.* at 48.

7

or walk in an 8-hour day, Kirchner responded "as long as I keep moving, it's better. When I stop or sit, then it just, I get so stiff I can't keep going. It takes me a long time to get up."[16]

### 3. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Roger F. Marquardt with a hypothetical for an individual who:

> could occasionally lift 20 pounds and frequently lift 10 pounds. She would be able to stand or walk for six hours in an eight hour day, and sit for six hours in an eight hour work day. Her ability to push and pull including the operation of hand and foot controls would be unlimited within the above weights.
>
> The individual would be able to occasionally climb ramps and stairs; never climb ladders, ropes or scaffolding; she could occasionally balance, stoop, kneel, crouch, crawl and reach overhead; she would need to avoid concentrated exposure to hazards such as heights and machinery as well as noise. Further, she would be limited to simple routine tasks.

(Administrative Record at 52.) The vocational expert testified that under such limitations, Kirchner could return to her past relevant work as a cashier at a self-service convenience store. The vocational expert also opined that given Kirchner's age, education, and past relevant work history, there would be a range of unskilled light positions which she could perform. For example, the vocational expert testified that Kirchner could perform the following work: (1) office helper (1,200 positions in Iowa and 200,000 positions in the nation), (2) library aide (800 positions in Iowa and 700,000 positions in the nation), and (3) counter attendant (5,000 positions in Iowa and 500,000 positions in the nation).

The ALJ also asked the vocational expert whether any of these jobs would be available if the hypothetical individual would miss three or more days of work per month.

---

[16] *Id.* at 49.

8

The vocational expert testified that with additional limitations, Kirchner would be precluded from competitive employment.

## B. Kirchner's Medical History

On February 12, 2008, Kirchner visited the emergency room and complained of a headache lasting "virtually constantly for the last eight weeks."[17] Dr. Paul Jensen, M.D., the examining doctor, noted that Kirchner "really won't describe the headache for me, despite my asking."[18] However, Dr. Jensen did find that Kirchner suffers from photophobia, nausea, and difficulty maintaining concentration when the headache is most severe. Upon examination, Dr. Jensen diagnosed Kirchner with persistent headaches despite ongoing treatment and thyroid enlargement. Dr. Jensen arranged for a brain MRI, and recommended medication as treatment. The brain MRI was negative. Dr. David E. Jensen, M.D., interpreted the MRI and found the "possibility of acute right maxillary sinusitis."[19]

On April 24, 2008, Kirchner met with Dr. Mary Goodsett, M.D., for a neurologic consultation regarding her headaches. Dr. Goodsett noted that:

> [Kirchner's] headaches started last June with no clear cause. They gradually worsened over the last several months, and particularly the last 18 weeks have been much worse. The pain is generalized, but most pronounced in the bioccipital/biparietal area. She also has chronic neck pain. . . . The pain is constant. It waxes and wanes in intensity, but without any clear exacerbations or relievers. . . . When the pain is more severe, she has photophobia, blurred vision, and nausea, but no vomiting.

---

[17] Administrative Record at 293.

[18] *Id.*

[19] Administrative Record at 282.

9

(Administrative Record at 287.) Upon examination, Dr. Goodsett diagnosed Kirchner with chronic daily headaches. Dr. Goodsett opined that Kirchner's headaches had "a migrainous quality."[20] Dr. Goodsett also noted some symptoms of cervical myofascial pain which contributed to her headaches. Dr. Goodsett recommended medication and physical therapy as treatment.

On July 2, 2008, Kirchner met with Dr. Tanya Vreeke, D.O., complaining of worsening chronic pain and chronic fatigue. Kirchner reported that "[s]he is tired all the time, muscles ache all the time, [and] she can't seem to function."[21] She also reported that her headaches had not gotten any better. Kirchner stated that physical therapy had helped some of her pain, and she was able to get at least 3 hours of sleep at night. Upon examination, Dr. Vreeke diagnosed Kirchner with chronic pain and chronic fatigue. Dr. Vreeke recommended medication as treatment.

On November 19, 2008, Kirchner had a follow-up appointment with Dr. Vreeke. Kirchner reported that she "is hurting worse all over; in her muscles and joints. She can do less and less."[22] Kirchner also reported lacking energy and having frequent crying spells. Dr. Vreeke noted that Kirchner's migraines improved, having them every 6-7 days, instead of every 3-4 days. Dr. Vreeke also noted improved sleeping and restless leg syndrome. Upon examination, Dr. Vreeke diagnosed Kirchner with chronic pain in all joints and bones, restless leg syndrome, chronic headaches, and insomnia. Dr. Vreeke recommended medication as treatment.

On March 6, 2009, Kirchner visited Dr. Jennifer Gibson, M.D., complaining of neck pain and headaches. Dr. Gibson noted that:

---

[20] *Id.* at 288.

[21] *Id.* at 416.

[22] Administrative Record at 410.

> The pain in her neck is still quite profound. It also goes down her arms. She feels she has decreased strength in both hands. She has numbness in her fingertips and thumb tip worse on the left and also pain and numbness with a feeling of falling asleep up both arms all the way up to the back of her neck. She wakes every few hours because of these symptoms.

(Administrative Record at 383.) Dr. Gibson also assessed an MRI of Kirchner's neck, and noted "[s]ignificant degenerative disease with foramen stenosis most pronounced between C4 and C6, moderate and bilateral at C4 and C6, and a little more severe at C5 with the severity being worse on the left than the right, as well as some flattening of cord."[23] Dr. Gibson was unable to rule out nerve impingement. Dr. Gibson recommended medication as treatment, and suggested a neurosurgical evaluation for Kirchner's neck pain.

On March 18, 2009, Kirchner met with Dr. David W. Beck, M.D., for a neurosurgery consultation regarding her neck pain. Dr. Beck noted that Kirchner rated her pain at 6 on a scale of 1 to 10 with 10 being the most severe pain. Upon examination and review of Kirchner's MRIs, Dr. Beck opined:

> Basically it is impossible to tell which disc level is triggering her symptoms. It is likely that it is the combination of the spondylosis and disc bulges that are doing it. She is not in any danger. . . . I think a 3 level anterior fusion would probably not take care of the problem. I am afraid I really have nothing surgical to offer her.

(Administrative Record at 376.) Additionally, Dr. Beck provided a letter dated April 21, 2009 to Disability Determination Services ("DDS") stating that Kirchner was neurologically intact. Dr. Beck opined that Kirchner could "lift and carry up to 20 pounds, sit, stand, walk, stoop, kneel, crawl, bend, handle objects, hear, speak, and

---

[23] *Id.* at 383.

11

travel."[24]  Dr. Beck concluded that "[a] work environment is not a problem as related to the neck."[25]

On June 22, 2009, Dr. Dennis Weis, M.D., reviewed Kirchner's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Kirchner.  Dr. Weis determined that Kirchner could:  (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations.  Dr. Weis also found that Kirchner could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl.  Dr. Weis further opined that Kirchner was limited in reaching in all directions and in hearing.  Dr. Weis determined that Kirchner should avoid concentrated exposure to noise and hazards, such as machinery and heights. Dr. Weis found no visual limitations.

On June 23, 2009, Kirchner was referred by DDS to Dr. Joseph L. Breitenstein, Ph.D., for a mental status evaluation.  When asked what compromised her ability to work, Kirchner responded "A lot."  She went on to report that:

> She has had a pain syndrome which has been emerging and worsening for 7 years.  She feels like her body is 'falling apart.'  She noted that her 'hips are going out. . . . I have pinched nerves in my neck, a bad disk, arthritis in my feet and neck, bunions, plantar fasciitis, restless leg syndrome, and migraines.'  She states that her pain 'never goes away.'  She estimates it is never below 5/10.

(Administrative Record at 449.)  Upon examination, Dr. Breitenstein opined that Kirchner appears to have some anxiety and depressive symptoms.  Dr. Breitenstein also noted that

---

[24] Administrative Record at 374.

[25] Id.

12

Kirchner "has not had standard cognitive-behavioral treatment or medication which might help her cope with her chronic pain more effectively."[26] Dr. Breitenstein diagnosed Kirchner with adjustment disorder with mixed anxiety and depressed mood secondary to chronic pain. Dr. Breitenstein concluded that:

> [Kirchner's] apparently resultant anxious and depressive symptoms do not appear to significantly impair her ability to understand, remember, and carry out simple instructions. [Kirchner] attributes almost all of her disability upon her physical condition and psychological factors have gone untreated. She appears to have a good work ethic and demonstrates no problems in responding appropriately to supervisors and coworkers. She has a slight impairment being able to maintain concentration, attention, and work pace particularly when affected by a migraine. Given her general condition she would do better in a less stressful job in an informally accommodating employment setting.

(Administrative Record at 453.)

On June 25, 2009, Kirchner returned to Dr. Gibson, complaining of neck pain, headaches, hip and shoulder pain, restless leg syndrome, sleep disorder, hand problems, foot problems, and depression. Kirchner rated her pain to range from 5 to 10 on a scale of 1 to 10. Dr. Gibson noted that her pain relief was only about 20%-30%. Dr. Gibson concluded that Kirchner "appears to be quite impaired and most likely would have difficulty maintaining a job or even training for a job at this time. It may be time for her to think about applying for disability[.]"[27]

On July 21, 2009, Dr. Carole Kazmierski, Ph.D., reviewed Kirchner's medical records and provided DDS with a psychiatric review technique assessment for Kirchner. Dr. Kazmierski diagnosed Kirchner with adjustment disorder. Dr. Kazmierski determined

---

[26] Administrative Record at 453.

[27] Administrative Record at 526.

that Kirchner had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Kazmierski concluded that:

> Although [Kirchner] does evidence some symptoms of depression and anxiety, these symptoms appear relatively mild and [she] has not sought specialized mental health treatment. A recent psychological [consultative examination] found [Kirchner's] cognitive functioning intact. . . . Based on available evidence, [Kirchner's] mental impairment appears nonsevere. It should not significantly restrict her work related functioning.

(Administrative Record at 466.)

On July 29, 2009, Kirchner met with Dr. Alireza Yarahmadi, M.D., complaining of migraine headaches and insomnia. Dr. Yarahmadi noted that:

> [Kirchner] had a chronic constant headache, which is a 5/10 on average. She also has some migraine attacks with photosensitivity and visual changes. Migraine attacks may occur three times a week. Migraines usually last between eight hours up to one day.

(Administrative Record at 484.) Upon examination, Dr. Yarahmadi diagnosed Kirchner with onset insomnia, restless leg syndrome, constant chronic daily headaches likely related to fibromyalgia or underlying depression, migraine attacks two or three times per week, and multiple tender points and pain syndrome, including plantar fasciitis, arthritis, and bursitis. Dr. Yarahmadi recommended medication as treatment.

On August 3, 2009, Kirchner had a follow-up appointment with Dr. Gibson. Kirchner continued to suffer from the same health problems, including neck pain, migraine headaches, hip and shoulder pain, restless leg syndrome, sleep disorder, foot problems, depression, and fibromyalgia. Dr. Gibson opined that:

> [Kirchner] has been extremely functionally impaired as a result of all of the above issues. She no longer can do the usual

14

activities of daily living that she had done previously. She does not do dishes, vacuuming, sweeping, making beds. She does not unload groceries although she is able to go to the store. She no longer does any gardening. She only does very minimal amount of laundry. She cannot dress herself without assistance. She sleeps extremely poorly, only two to four hours a night. She has daily headaches which have persisted since this neck pain began, and although she has had some improvement in migraines with headache treatment, she still has two to three severe migraines a week. She has not been able to do any job activities she had done previously due to her constant levels of pain.

(Administrative Record at 521.) Dr. Gibson continued Kirchner on medication as treatment.

On March 6, 2010, Dr. Aaron Quinn, Ph.D., reviewed Kirchner's medical records and provided DDS with a psychiatric review technique and mental RFC assessment for Kirchner. On the psychiatric review technique assessment, Dr. Quinn diagnosed Kirchner with depression and adjustment disorder with mixed anxiety and depressed mood. Dr. Quinn determined that Kirchner had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Quinn determined that Kirchner was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and respond to changes in the work setting. Dr. Quinn concluded that:

[Kirchner] is expected to have work-related difficulties with extended attention, detailed instructions, stress management, and change. [She] does, though, retain the ability to complete at least simple repetitive tasks on a sustained basis.

15

(Administrative Record at 550.)

On April 26, 2010, Kirchner met with Dr. Yarahmadi for a follow-up appointment. Dr. Yarahmadi reviewed a brain MRI with Kirchner. Dr. Yarahmadi explained that the MRI findings were nonspecific and the abnormal signals were commonly seen in patients suffering from migraine headaches. Upon examination, Dr. Yarahmadi diagnosed Kirchner with migraine headaches, fibromyalgia, and restless leg syndrome. Dr. Yarahmadi recommended Kirchner continue the treatment she was undergoing at that time.

On November 8, 2010, at the request of Kirchner's attorney, Dr. Vreeke filled out a "Physical Residual Functional Capacity Questionnaire" for Kirchner. Dr. Vreeke diagnosed Kirchner with chronic pain, fibromyalgia, and nerve impingement on her cervical spine. Dr. Vreeke opined that Kirchner's prognosis was poor. Dr. Vreeke noted that Kirchner's symptoms included continual pain all over, worse in her neck and head, fatigue, and poor memory. Dr. Vreeke also identified depression as a factor affecting Kirchner's physical condition. Dr. Vreeke indicated that Kirchner would be incapable of even "low stress" jobs. With regard to her functional limitations, Dr. Vreeke determined that Kirchner could: (1) sit for 30 minutes at one time, (2) stand for 2 hours at one time, (3) sit for less than 2 hours total in an eight-hour workday, (4) stand/walk for about 2 hours in an eight-hour workday, and (5) occasionally lift less than 10 pounds, rarely lift 10 pounds, and never lift more than 20 pounds. Dr. Vreeke also noted that Kirchner would need to walk for 15 minutes every 20 to 30 minutes and take an unscheduled break every 30 minutes for 10 to 15 minutes. Lastly, Dr. Vreeke opined that Kirchner would be absent four or more days per month as a result of her impairments or treatment for her impairments.

# V. CONCLUSIONS OF LAW

## A. ALJ's Disability Determination

The ALJ determined that Kirchner is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the

17

> fourth step asks whether the claimant has the residual
> functional capacity to do past relevant work. If so, the
> claimant is not disabled. Fifth, the ALJ determines whether
> the claimant can perform other jobs in the economy. If so, the
> claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant

"bears the burden of demonstrating an inability to return to [his] or her past relevant

work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*,

524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden

shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC

[(residual functional capacity)], age, education, and work experience, there [are] a

significant number of other jobs in the national economy that [the claimant] could

perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir.

2005)). The RFC is the most an individual can do despite the combined effect of all of his

or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for

determining "'a claimant's RFC based on all the relevant evidence including the medical

records, observations of treating physicians and others, and an individual's own description

of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011)

(quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Kirchner had not

engaged in substantial gainful activity since March 27, 2009. At the second step, the ALJ

concluded from the medical evidence that Kirchner had the following severe impairments:

fibromyalgia, headaches, migraines, degenerative disc disease of the cervical spine,

hearing loss, depression, and adjustment disorder with mixed anxiety and depressed mood.

At the third step, the ALJ found that Kirchner did not have an impairment or combination

of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ

determined Kirchner's RFC as follows:

18

> [Kirchner] has the residual functional capacity to perform light work . . . involving lifting twenty pounds occasionally and ten pounds frequently; stand/walk six hours of an eight hour workday; sit six hours of an eight hour workday; ability to push/pull including operation of hand and foot controls would be unlimited within the lifting restrictions; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl, and reach overhead; avoid concentrated exposure to hazards such as heights and machinery as well as loud noise; and limited to simple, routine tasks.

(Administrative Record at 22.) Also at the fourth step, the ALJ determined that Kirchner was capable of performing her past relevant work as a cashier at a self-service convenience store. In the alternative, at the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Kirchner could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Kirchner was not disabled.

## B. Objections Raised By Claimant

Kirchner argues that the ALJ erred in two respects. First, Kirchner argues that the ALJ failed to properly evaluate the opinions of Dr. Vreeke, a treating physician. Second, Kirchner argues that the ALJ's RFC assessment is deficient because she failed to consider how often and how long Kirchner would need to be absent from work due to her difficulties with migraine headaches.

### 1. Dr. Vreeke's Opinions

Kirchner argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Vreeke. Specifically, Kirchner argues that the ALJ failed to properly explain her reasons for accepting or rejecting Dr. Vreeke's opinions in her decision. Kirchner concludes that this matter should be remanded for proper consideration of Dr. Vreeke's opinions.

19

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided

by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In her decision, the ALJ provides a thorough review of Dr. Vreeke's opinions from the November 8, 2010 "Physical Residual Functional Capacity Questionnaire."[28] In weighing Dr. Vreeke's opinions, the ALJ concluded:

> The undersigned affords some weight to the opinion due to the treating history and some limitations have been incorporated into the residual functional capacity. However, the opinion was rendered at the request of [Kirchner's] representative and does not appear to be totally consistent with treatment records, which do not reflect a basis for leg elevation or limited use of the hands and fingers. In addition, sitting limitations appear inconsistent with observations by the consulting psychologist who observed [Kirchner] to sit comfortably over an hour in what could be described as a less than comfortable chair.

(Administrative Record at 25-26.)

In reviewing the ALJ's decision, the Court bears in mind that an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quotation omitted). Furthermore, if an ALJ rejects the opinions of a treating physician, the regulations require that the ALJ give "good reasons" for rejecting those opinions. *See* 20 C.F.R. § 404.1527(d)(2). The Court finds that the ALJ has not fully met these requirements.

Here, the ALJ offers three reasons for discounting the opinions of Dr. Vreeke. First, the ALJ points out that Dr. Vreeke's opinion "was rendered at the request of

---

[28] *See* Administrative Record at 25.

[Kirchner's] representative." It is unclear to the Court why the request of a claimant's attorney as opposed to DDS, for example, would affect the validity of a long-time treating physician's opinions. *See Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) (providing that an ALJ's rejection of a doctor's opinion on the basis that the opinion was solicited by a claimant or claimant's representative constitutes an insufficient reason for such rejection). The Court is unconvinced that this is a "good" reason for rejecting Dr. Vreeke's opinions. Second, the ALJ points out that Dr. Vreeke's opinions appear inconsistent with treatment records, "which do not reflect a basis for leg elevation or limited use of the hands and fingers."[29] While this statement may be true to the extent that Kirchner's treatment notes do not contain specific information regarding the need for her to elevate her legs, and only some information suggesting a limit to the use her hands, Dr. Vreeke's answers in the questionnaire were based on Kirchner performing sedentary work during an eight-hour workday, an issue that was never presented during Dr. Vreeke's long-term treatment of Kirchner.[30] Furthermore, these are minor issues in comparison to Kirchner's long-term issues with migraine headaches and pain. The Court is unconvinced that focusing on minor issues not raised in a patient's long-term treatment history constitutes a "good" reason for discounting the opinions of a long-time treating physician. Lastly, the ALJ suggests that Dr. Vreeke's sitting limitations are "inconsistent with observations by the consulting psychologist who observed [Kirchner] to sit comfortably

---

[29] Administrative Record at 26.

[30] *See* Administrative Record at 383 (opinions of Dr. Gibson, a treating doctor, discussing Kirchner's difficulties with her hands and arms); 443 (non-examining agency doctor opining that Kirchner would be limited in reaching all directions, particularly overhead).

22

over an hour in what could be described as a less than comfortable chair."[31] Again, while this statement may be true, it fails to paint the entire picture. The consulting psychologist met with Kirchner one time, for one hour. Contrary to the ALJ's statement, the consulting psychologist stated that he observed Kirchner sit "relatively" comfortably, but got up "quite slowly."[32] Again, the Court concludes that this is not a "good" reason for discounting Dr. Vreeke's opinions. Because the ALJ has failed to give "good reasons" for rejecting the opinions of Dr. Vreeke, and failed in her duty to fully and fairly develop the record with regard to Dr. Vreeke's opinions, the Court finds that this matter should be remanded for further consideration of Dr. Vreeke's opinions. On remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Vreeke's opinions and support her reasons with evidence from the record.

### 2. RFC Assessment

Kirchner argues that the ALJ's RFC assessment is incomplete because the ALJ failed to consider whether her difficulties with migraine headaches would cause difficulties with absenteeism if employed in a full-time job. Kirchner points out that in her decision, the ALJ found she suffered a severe impairment due to her migraine headaches. Kirchner further points out the virtually her entire medical history deals in some part with her migraine headache problem, including six trips to the emergency room due to migraines.[33] Additionally, Kirchner points to evidence in the record which suggests her migraine headaches lasted 8 to 10 hours, or sometimes even longer.[34] Given this evidence, Kirchner maintains that "[a]t a minimum, the ALJ's decision should be reversed and this

---

[31] Administrative Record at 26.

[32] *Id.* at 451.

[33] *See* Kirchner's Brief (docket number 10) at 20-23.

[34] *See* Administrative Record at 484; 522.

23

matter remanded for consideration of Ms. Kirchner's need for unscheduled breaks and absences."[35]

An ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Furthermore, an ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Having reviewed the entire record, the Court believes that there is significant evidence in the record regarding Kirchner's difficulties with migraine headaches. Because

---

[35] Kirchner's Reply Brief (docket number 12) at 5.

the ALJ determined that her migraine headaches constitute a severe impairment, but did not address this issue in her RFC assessment, and these headaches can last for eight hours or more, the Court concludes that the ALJ failed to fully and fairly develop the record on this issue. *See Cox*, 495 F.3d at 618 (discussing ALJ's duty to fully and fairly develop the record); *Guilliams*, 393 F.3d at 803 (discussing requirement that a claimant's RFC must be based on all relevant evidence). Accordingly, on remand, the ALJ must fully and fairly develop the record with regard to Kirchner's difficulties with migraine headaches and discuss how those difficultes relate to her RFC. In particular, the ALJ should address how Kirchner's migraine headaches may or may not affect her need for unscheduled breaks in an eight-hour workday or her need for absences in a forty-hour workweek.

### C. *Reversal or Remand*

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings
> and transcript of the record, a judgment affirming, modifying,
> or reversing the decision of the Secretary, with our without
> remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability
> and the claimant has demonstrated his [or her] disability by medical evidence
> on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*,

25

833 F.2d at 127. Instead, the ALJ simply failed to: (1) provide good reasons for rejecting the opinions of Dr. Vreeke, and (2) fully and fairly develop the record with regard to Kirchner's difficulties with migraine headaches, and how such problems relate to her RFC. Accordingly, the Court finds that remand is appropriate.

## VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Vreeke's opinions, and support her reasons with evidence from the record. The ALJ must also reconsider her RFC assessment for Kirchner with regard to her difficulties with migraine headaches.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this 13th day of May, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

26